## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**REGIONS BANK, as Guardian of the Estate of O.D., a minor,**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant.**

**Case No.  19-CV-01202-SPM**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dionne Davis filed this medical malpractice action against the United States under the Federal Tort Claims Act ("FTCA") on behalf of her young son, O.D.[1] (Doc. 1). The Court later granted Mrs. Davis's motion to substitute Regions Bank as plaintiff and guardian of O.D.'s estate in lieu of herself. (Docs. 60, 65). Regions alleged that negligent care by Mrs. Davis's physician, Dr. Kallie Harrison, during O.D.'s delivery resulted in shoulder dystocia and permanent injury to O.D.'s right brachial plexus. The brachial plexus is a network of intertwined nerves that control movement and sensation in the shoulder, arm, and hand. (Doc. 66, p. 6).

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1346(b) and 2674. At the time of her treatment of Mrs. Davis, Dr. Harrison was employed by SIHF Healthcare ("SIHF"), a federally supported grant entity, and thus she is deemed an employee of the United States Public Health Service in accordance with 42 U.S.C. § 233(g). Venue is uncontested and proper in the

---

[1] In her Complaint, Mrs. Davis also sought damages against Touchette Regional Hospital Inc. The two parties reached a settlement in this action before trial. (Doc. 34).

Southern District of Illinois. It is likewise uncontested that Mrs. Davis exhausted her administrative remedies with the United States Department of Health and Human Services by submitting an administrative tort claim that sought damages. *See Zurba v. United States*, 318 F.3d 736, 738 (7th Cir. 2003) (citing 28 U.S.C. § 2675(b)).

The Court conducted a bench trial from March 6-9, 2023, and now makes the following findings of fact and conclusions of law.

<u>FACTS</u>

### *Parties*

Dr. Harrison earned her Bachelor of Science degree from Ball State University in 2007. (Doc. 69, p. 33). She earned her medical degree and completed her residency in Obstetrics, Gynecology, and Women's Health at St. Louis University School of Medicine in 2015. (*Id.*). From 2015 to 2017, Dr. Harrison was employed by SIHF at Touchette Regional Hospital. (*Id.* at 32). She left SIHF and worked at BJC Medical Group in Shiloh, Illinois from 2017 to June 2021. (*Id.* at 31-32). She currently works as a hospitalist in Obstetrics and Gynecology at Mercy Hospital in St. Louis, Missouri. (*Id.*). Dr. Harrison became board certified in Obstetrics and Gynecology by the American Board of Obstetrics and Gynecology after O.D. was delivered. (*Id.* at 30, 33).

O.D. is the sixth child born to Mrs. Davis. (Doc. 66, p. 3). O.D.'s father is Ou'Mara Davis, Dionne's husband. (*Id.* at 2). O.D. has two full siblings and three maternal half-siblings. (*Id.* at 3).

O.D. briefly attended the trial in this case and was observed to be a somewhat shy six-year-old. O.D.'s right arm is obviously damaged. He is currently home-schooled with a teacher from the family's school district. (Doc. 69, p. 116).

### *Shoulder Dystocia*

There is some disagreement in the obstetrical field about how to define shoulder dystocia, but, in its simplest terms, it can be defined as a difficult delivery of a baby's anterior impacted shoulder during a vaginal delivery. (Doc. 69, pp. 44-45; Doc. 71, p. 13; Doc. 73, p. 62). Others in the field define it less by mechanics and more based on outward signs of difficulty delivering for a certain period of time. (Doc. 73, pp. 62, 153). There is also disagreement about whether a shoulder dystocia can become free spontaneously. (Doc. 69, p. 34; Doc. 71, p. 13; Doc. 73, pp. 62, 153). Sometimes shoulder dystocia is heralded by a "turtle-sign," which is the appearance of the baby's head from the vaginal canal followed by retraction. (Doc. 69, p. 100; Doc. 71, pp. 47-48).

Shoulder dystocia is unpredictable and viewed as an obstetrical emergency because after five to seven minutes, the baby could lose blood flow and oxygen. (Doc. 71, p. 14, 24; Doc. 73, p. 99). As a result, all obstetricians need to be prepared to respond to and manage the emergency. (Doc. 71, pp. 14-15; Doc. 73, p. 99).

### *Prenatal Care of O.D.*

Touchette admitted Mrs. Davis for labor and delivery at 12:17 p.m. on July 30, 2016. (Doc. 66, p. 4). Mrs. Davis and O.D.'s care was transferred from Mrs. Davis's usual obstetrician to Dr. Kallie Harrison at approximately 8 a.m. on July 31, 2016. (Doc. 66, p. 3; Doc. 69, p. 99).

Per her usual practice, Dr. Harrison would have reviewed Mrs. Davis's chart to learn about her prior deliveries and the size of her largest baby. (Doc. 69, p. 61). Mrs. Davis had previously vaginally delivered five full-term, living children. (*Id.* at 62, 116). All of Mrs. Davis's prior pregnancies involved vaginal births without complications or operative assistance. (Doc. 69, p. 63-63, Doc. 71, p. 74). Her second child was her largest, weighing 8 pounds, 2 ounces. (Doc. 66, p. 3). As a result, Mrs. Davis had "a proven pelvis," which means that she birthed a large baby previously without difficulty. (Doc. 73, p. 68). Mrs. Davis also did not have gestational diabetes during her pregnancy with O.D., which is sometimes associated with shoulder dystocia. (Doc. 71, p. 48).

### ***Labor and Delivery of O.D.***

With Mrs. Davis during labor and delivery of O.D. were Mr. Davis, Melanie Fort ("sister-in-law" to Mrs. Davis by virtue of a relationship with her brother), Dr. Harrison, Delivery Nurse Donna Mitchell Brown, and Nursery Nurse Michelle Jackson. (Doc. 66, p. 4).

During labor and delivery, "fetal heart tracing" captures the baby's fetal heart rate and the mother's uterine activity. (Doc. 69, p. 78; Doc. 73, p. 53). In Mrs. Davis's case, tracings were taken during induction of labor via an external strap across her belly. (*Id.*). The fetal heart tracings revealed that O.D. was never in any danger of imminent asphyxic injury; the readings were perfectly normal and reflected no distress. (Doc. 69, pp. 80, 86; Doc. 71, p. 25; Doc. 73, p. 55). As a result, there would be no justification to use excessive traction in the birth of O.D. (Doc. 69, p. 86).

The first stage of labor occurs when the expectant mother starts contractions and lasts until her cervix is fully dilated. (Doc. 71, p. 83). Mrs. Davis received Cytotec to dilate her cervix and Pitocin to start contractions (Doc. 69, p. 60; Doc. 73 p. 42). At approximately 8:04 a.m., finding the cervix ready for labor, Dr. Harrison ruptured the amniotic sac to induce labor. (Doc. 66, p. 4). At 10:10 a.m. an anesthesiologist began a spinal epidural for Mrs. Davis. (*Id.*).

The second stage of labor begins when the cervix is completely dilated and ends with the birth of the baby. (Doc. 66, p. 5; Doc. 69, p. 69). This is known as the "active pushing stage." (Doc. 69, p. 69). There are endogenous, or natural, forces placed on the baby during labor.  (Doc. 71, p. 58, Doc. 73, p. 71). There is also rotation of the baby during the natural process of labor. (Doc. 71, p. 58; Doc. 73, pp. 70-71). Here, the attending nurses alerted Dr. Harrison that her attention was needed in the delivery room after Mrs. Davis became completely dilated and had completed a practice push with the nurses at approximately 11:45 a.m. (Doc. 69, pp. 101, 105-106).

Mrs. Davis's second stage of labor was 27 minutes and was marked by the birth of O.D. at 11:57 a.m. (Doc. 66, p. 5; Doc. 69, p. 70). Mrs. Davis actively pushed for six minutes. (Doc. 69, p. 105). Nurse Brown documented a spontaneous vaginal delivery. (Doc. 69, p. 70; Def. Ex. 204).  There does not appear to be disagreement that during birth, O.D. was in the left occiput anterior ("LOA") position leading up to and during some of the birth. (Doc. 66, p. 5; Doc. 69, pp. 66-67; Doc. 73, pp. 117, 120). In the LOA position, the baby's head is slightly off center in the pelvis with the

back of the head toward the mother's left thigh and the right shoulder upward. (Doc. 66, p. 5).

Dr. Harrison stated that she remembered delivering O.D. because of the unusual situation meeting Mrs. Davis that day for the first time. (Doc. 69, pp.72-75). She also said that a claim was filed shortly after delivery, giving her reason to remember details of the delivery. (*Id.* at 75). Dr. Harrison testified that she stands throughout the entire delivery process (*Id.* at 101). She said that she did not observe a turtle sign during O.D.'s delivery. (*Id.* at 104-105). She stated that once she delivered the fetal head, the shoulder and the rest of O.D. delivered very quickly. (*Id.* at 82, 105). She also testified that shoulder dystocia-related maneuvers were not used because "there was no shoulder dystocia." (*Id.* at 54).

Understandably, Mrs. Davis has no clear recollection of the actions in which Dr. Harrison engaged, including breaking her water. (Doc. 69, p. 119). She did recall Dr. Harrison aggressively demanding her to push. (*Id.* at 120-121). She also stated that Dr. Harrison sat during most of the birth, though at some point she stood up. (*Id.* at 121-122). A video taken by Mrs. Fort before the birth does not show a stool or seat for Dr. Harrison. (Def. Ex. 227).

For their part, Mr. Davis and Ms. Fort, through deposition and, in Mr. Davis's case, testimony at trial, appeared to state that a plunger type or vacuum device was used to deliver O.D. (Doc. 71, pp. 102, 120; Pl. Ex. 133, p. 36; Def. Ex. 275, p. 16). Both also stated that Dr. Harrison sat during some of the birth. (Doc. 71, pp. 94, 97; Pl. Ex. 133, p. 36). During his testimony, Mr. Davis described Dr. Harrison as "tugging and pulling" for "a few minutes" with a device but could not see the doctor's

hands because his view was blocked. (Doc. 71, pp. 93-94, 97). When asked, he could not describe the device and he could not recall previously describing it as a plunger, though he later acknowledged in his testimony that he had described it as a plunger. (Doc. 71, pp. 102, 120-121).

Dr. Harrison testified that traction applied to a baby that causes an injury to the brachial plexus would be characterized as excessive traction. (*Id.* at 88). She also admitted that the standard of care required her to know that when there was a shoulder dystocia present and excessive traction was used, the likely injury would be a brachial plexus injury. (*Id.* at 46-47). She stated that she used the "normal amount" of "pulling or application of traction that is required to deliver in the usual fashion." (*Id.* at 106). Dr. Harrison asserted that most brachial plexus injuries occur in the absence of shoulder dystocia. (*Id.* at 87).

The third stage of labor is the time from the delivery of the baby until the delivery of the placenta. (Doc. 66, p. 5). Mrs. Davis's third stage of labor was 2 minutes, culminating in the spontaneous delivery of the placenta at 11:59 a.m. (Doc. 66, p. 5; Doc. 69, p. 70).

Dr. Harrison handed off O.D. to Nursery Nurse Michelle Jackson. Nurse Jackson did not recall Dr. Harrison pulling on O.D. during delivery, although she was setting up the warming table during delivery. (Pl. Ex. 135, pp. 32, 35). She did not recall Dr. Harrison saying anything about shoulder dystocia. (*Id.* at 32). She stated that she would have documented a shoulder dystocia if identified. (*Id.*). She described the delivery of O.D. as "normal" based on review of the medical records (*Id.* at 29-30). Video taken by Ms. Fort after the delivery reveals that Nurse Jackson

did a reflex test and observed that O.D.'s right arm was not as responsive as the left arm. (Pl. Ex. 21). In the video, Ms. Fort stated, "You did good, sis. She did that like a G." (*Id.*). Right after, Nurse Brown stated, "You didn't have to push long at all." (*Id.*).

At birth, O.D. weighed 7 pounds, 3 ounces, making him almost a pound smaller than Mrs. Davis' second child. (Doc. 66, p. 5). He measured 21.1 inches in length. (*Id.*). His head circumference was 13.8 inches, his abdominal circumference was 12 inches and his chest circumference was 13.2 inches. (*Id.*). His appearance (skin color), pulse (heart rate), grimace (reflexes), activity (muscle tone), and respiration (breathing effort) ("APGAR") scores were 7 at one minute and 9 at 5 minutes. (*Id.*).

No shoulder dystocia was noted in the medical records. (Doc. 69, p. 76). Following delivery, Mrs. Davis did not have any lacerations. (Doc. 66, p. 5). Regions verbally conceded that, "more likely than not," a vacuum was not used during O.D.'s birth. (Doc. 69, p. 13).

As in many medical malpractice cases, this case involved the opinions of competing experts as to deviations from the standard of care and the origin of the injury. On behalf of the United States, Dr. Leonard Zamore testified that if O.D.'s shoulders did not turn into the oblique position once his right should hit the pubic symphysis joint in Mrs. Davis's pelvis, O.D.'s shoulder would have become impacted, which could cause a shoulder dystocia. (Doc. 71, p. 13; Doc. 73, pp. 70-71, 120, 139). If an impaction does not clear on its own, the shoulder cannot be delivered, no matter how much traction is used. (Doc. 73, p. 139). Dr. Zamore said that O.D. most likely

turned oblique because Mrs. Davis had a normal spontaneous birth. (*Id.* at 120). He clarified that excessive traction will not cause a brachial plexus injury in the absence of impaction or shoulder dystocia. (*Id.* at 116-117). He concluded that he believed O.D.'s brachial plexus injury occurred due to endogenous forces. (*Id.* at 143). He also agreed that because genetic testing had not been completed to determine if O.D. had a predisposition for brachial plexus injury, genetics could not be ruled out as a possible contributor. (*Id.* at 144).

On behalf of Regions, Dr. Michael S. Cardwell testified that if there is a shoulder dystocia present and the doctor applies excessive traction, a permanent brachial plexus injury can result. (Doc. 71, p. 14). Dr. Zamore agreed. (Doc. 73, p. 64). Both Dr. Cardwell and Dr. Zamore also agreed that gentle downward traction will not cause a brachial plexus injury if there is a shoulder dystocia. (Doc. 71, p. 23; Doc. 73, p. 65).

In his testimony, Dr. Cardwell emphasized that O.D.'s brachial plexus injury was due to Dr. Harrison's deviations from the standard of care, particularly the application of excessive traction when a shoulder dystocia was present. However, Dr. Cardwell concurred with Dr. Zamore that maternal expulsive forces alone can cause a nerve injury. (Doc. 71, p. 66). He recognized that brachial plexus injuries can occur in the absence of shoulder dystocia. (*Id.* at 79). He stated that a brachial plexus injury may precede delivery and even occur prior to labor. (*Id.* at 57). Dr. Cardwell additionally agreed that excessive physician-applied traction can cause cervical lacerations. (*Id.* at 60).

During his testimony, Dr. Cardwell acknowledged that *Williams Obstetrics*, which he described as a well-respected textbook in the field of obstetrics, discussed brachial plexopathy in the 23rd Edition and stated that it "usually results from the stretch on the plexus during passage of the fetus through the birth canal and subsequent delivery." (*Id.* at 56-57, 68).  He also agreed that according to the textbook's reports on a 2003 study by Gonik et al., "stretching of the brachial plexus is greater from endogenous forces which include maternal pushing and uterine contractions than from iatrogenic applied force." (*Id.* at 57). He concurred that the natural forces of labor can and do cause brachial plexus injuries without traction-type forces. (*Id.* at 57, 68).

DISCUSSION

### *Applicable Legal Standards*

The FTCA provides a remedy for personal injury caused by the negligent or wrongful act of any government employee acting within the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place" where the act occurred. 28 U.S.C.§ 1346(b)(1); *See United States v. Muniz*, 374 U.S. 150, 153 (1963).

In suits properly brought under the FTCA, the Court applies the law of the state in which the acts or omissions occurred. *See* 28 U.S.C. § 1346(b)(1). Accordingly, Illinois law regarding medical professional negligence governs this case. *See* IL-IPICIV 1.05.01.

Under Illinois law, in a medical malpractice action, a plaintiff bears the burden of showing: "(1) the proper standard of care by which a physician's conduct

may be measured, (2) a negligent failure to comply with the applicable standard, and (3) a resulting injury proximately caused by the physician's lack of skill or care." *Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002) (quoting *Donais v. United States*, 232 F.3d 595, 598 (7th Cir. 2000)); *see also Campbell v. United States*, 904 F.2d 1188, 1191 (7th Cir. 1990). A plaintiff must prove each element by a preponderance of the evidence. *See Pumala v. Spios*, 517 N.E.2d 295, 298 (Ill. App. Ct. 1987). Medical expert testimony is required to establish the applicable standard of care and the medical professional's deviation from it. *See Campbell*, 904 F.2d at 1193; *see also Sullivan*, 209 Ill.2d at 112.

"Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011) (quoting *Johnson v. Loyola Univ. Med. Ctr.*, 893 N.E.2d 267, 272 (2008)). Proximate causation exists where the defendant's negligence was "a material and substantial element in bringing about the injury." *Wille v. Freeland*, 2015 IL App (2d) 140964-U, at ¶ 21 (2015) (quoting *First Springfield Bank & Tr. v. Galman*, 720 N.E.2d 1068, 1072 (Ill. 1999)). To establish proximate cause, a plaintiff must show cause-in-fact and legal cause. *See Morisch*, 653 F.3d at 530. For cause-in-fact, a plaintiff must show that "there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id*. (quoting *Coole v. Cent. Area Recycling,* 893 N.E.2d 303, 310 (2008)). For legal cause, a plaintiff must also demonstrate "that the injury was foreseeable as the type of harm that a

reasonable person would expect to see as a likely result of their conduct." *Id.* (quoting *LaSalle Bank, N.A. v. C/HCA Devel. Corp.*, 893 N.E.2d 949, 970 (2008)).

With respect to medical expert testimony in particular, there are two foundational requirements: "the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify" and the expert must be familiar "with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 654 (Ill. 2004) (citing *Jones v. O'Young*, 607 N.E.2d 224, 225 (Ill. 1992).

### *Standard of Care*

Here, Dr. Harris is a specialist and thus, she needed to possess and use the knowledge, skill, and care ordinarily used by a reasonably careful specialist in the field at the time of O.D.'s delivery. *See* IL-IPICIV 1.05.01.

Considering all the evidence, the Court mostly agrees with Regions in its proposed conclusions of law on the applicable standard of care during O.D.'s labor and delivery.[2] The applicable standard of care required Dr. Harrison to:

1. Recognize a shoulder dystocia if one was present during delivery;

2. Perform appropriate maneuvers when a shoulder dystocia is present;

3. Avoid applying excessive traction to the baby when a shoulder dystocia is present; and

---

[2] Regions proposed another standard of care regarding avoiding rushing the delivery process. Regions never clearly established that avoiding rushing the delivery process was a standard of care during trial through expert testimony. In the absence of impaction or shoulder dystocia, this hypothetical deviation also would not have met the standards for causation and would not have led to damages.

4.  Avoid pulling on the baby's head during delivery.

The question of whether a doctor deviated from the relevant standard of care is a question of fact. *Campbell v. United States,* 904 F.2d 1188, 1192 (7th Cir. 1990). Considering the evidence introduced at trial and discussed above, the Court concludes that Dr. Harrison did not deviate from the standards of care.

Medicine is not an exacting science; it incorporates individual judgment within the structure of established procedures. *See Walski v. Tiesenga,* 381 N.E.2d 279, 285 (1978); see also *Campbell,* 904 F.2d at 1192. A procedure that follows accepted medical standards may not yield a favorable outcome. That does not establish or constitute evidence of a deviation from the standard of care. *See Campbell,* 904 F.2d at 1192 (citing *Crawford v. Anagnostopoulos,* 387 N.E.2d 1064, 1069 (1979).

The Court has carefully considered all the evidence in light of the burden of proof that plaintiff bears. Based on the testimony of both obstetrical experts, brachial plexus injury is not synonymous with shoulder dystocia and can occur because of endogenous forces during labor. Taking those facts together with the standards of care that are trained towards identification and action in the event of a shoulder dystocia, the Court first looks to whether Regions has produced sufficient evidence to show that a shoulder dystocia likely occurred. If it is more likely O.D. did not have a shoulder dystocia or it quickly freed spontaneously, Dr. Harrison did not violate the standards of care and the injury more likely than not occurred from endogenous forces. Although O.D. suffered an injury to his right shoulder, and the Court is sympathetic to him and his family, there is insufficient evidence for the

Page 13 of 16

Court to find on this record that it is more likely than not that a persistent shoulder dystocia occurred. As a result, Dr. Harriman did not deviate the standards of care.

The eyewitness testimony and video in this case was very informative. The Court found Dr. Harrison to be a credible witness based on her recall of the labor and birth along with her candid nature when discussing definitions and complications due to impaction and shoulder dystocia. Dr. Harriman did not observe a turtle sign and was emphatic that a shoulder dystocia did not occur during O.D.'s birth. No shoulder dystocia was noted in the medical records from any of the medical professionals in the room. This corroborates Dr. Harriman's testimony. Video from after the birth also corroborates Dr. Harriman's testimony. Ms. Fort's and Nurse Brown's present sense statements in the video indicated a quick, easy delivery, not the obstetrical emergency that happens with a persistent shoulder dystocia.

In contrast, Ms. Fort lost credibility during her deposition. She was insistent that a plunger type device was used on O.D.'s head even though Regions has conceded that one was likely not used. She also stated that Dr. Harrison sat during the delivery even though Dr. Harrison said that she does not sit during the deliveries. Although not conclusive, video before the delivery did not show a stool or seat.

During his testimony at trial, Mr. Davis presented as extremely confused and his credibility also suffered. Similarly, he continued to claim that Dr. Harrison used a vacuum device when presented with his deposition testimony claiming as much. When asked, he could not describe the device and he could not recall previously describing it as a plunger though, oddly, he later acknowledged he had described it

Page 14 of 16

as a plunger. He also stated Dr. Harrison sat during some of the birth and later stood. He further contradicted himself when he said that Dr. Harrison tugged and pulled with a device even though he stated his view was blocked.

The Court next looks to whether Regions has produced sufficient evidence to show that excessive traction in the absence of shoulder dystocia caused O.D.'s brachial plexus injury. In his closing, counsel for Regions focused on Dr. Harrison's testimony in urging the Court to find for Regions. Counsel distilled Dr. Harrison's testimony on traction injuries down to her admitting that if there was a traction injury, she would be negligent. He stated that admission "end[ed] the case on the first day" and resulted in proof of the case "beyond a reasonable doubt." (Doc. 76, pp. 71, 73). But Dr. Harrison did not admit to applying the excessive traction – a more detailed review of the transcript revealed she stated excessive traction would be required to cause injury. She stated she used a normal amount of traction to deliver O.D. in the usual fashion. The question from Regions' counsel was framed in a way that presupposed the acceptance of an overly simplified recounting of deposition testimony from a pediatric neurosurgeon with no obstetrical training. That testimony in itself stretched the bounds of qualified expert testimony for labor related traction. Contrary to Regions' theory, Dr. Zamore testified that excessive traction will not cause a brachial plexus injury in the absence of impaction or shoulder dystocia. Also of note, Mrs. Davis did not have any lacerations that would indicate excessive traction during delivery. In sum, the Court did not find this exchange as enlightening as counsel did.

The reality is that Regions' position ignores the fact that the birth process involves a baby twisting through the birth canal and the concurrent presence of the forces of labor. These concurrent forces from different directions all place tension on the brachial plexus nerve. Genetic predisposition may also play a part. Regions did not present sufficient proof to discount the impact of endogenous forces or genetics in this case.

### CONCLUSION

For all of these reasons, the Clerk of Court is **DIRECTED** to enter judgment in favor of the Defendant United States of America.

**IT IS SO ORDERED.**

**DATED:  June 9, 2023**

**s/ _Stephen P. McGlynn_**
**STEPHEN P. McGLYNN**
**U.S. District Judge**
